# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

No. 5:08-CV-433-FL

CASSANDRA JONES O/B/O S.F., )
a Minor )
 )
       Plaintiff )
 )
    v. )     **MEMORANDUM AND**
 )     **RECOMMENDATION**
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
 )
    Defendant. )
_____ )

     This matter is before the Court on the parties' cross motions for Judgment on the

Pleadings [**DE's 10 & 18**]. The time for the parties to file any responses or replies has

expired. Accordingly, these motions are now ripe for disposition. The underlying action

seeks judicial review of the final decision by the Defendant denying Plaintiff's application

for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(b)(1), this matter

is before the undersigned for a memorandum and recommendation. For the reasons set forth

herein, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the

Pleadings [**DE-10**] be DENIED and the Defendant's Cross-Motion for Judgment on the

Pleadings [**DE-18**] GRANTED.

## Statement of the Case

     On June 16, 2003, Plaintiff applied for SSI on behalf of her minor child, S.F., alleging

that S.F. has been disabled since her birth. [Tr. 73-75].[1]  This application was denied on the initial and reconsideration levels of review. [Tr. 22-23].  Plaintiff requested and received a hearing before an Administrative Law Judge ("ALJ") on December 15, 2005. [Tr. 30-33].  The ALJ concluded that S.F. was not disabled during the relevant time period in a decision dated January 4, 2006. [Tr. 10-21].  On July 10, 2008, the Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Defendant. [Tr. 3-6].  Plaintiff filed the instant action on August 28, 2008.   **[DE-1]**.

## Standard of Review

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589.

---

[1]  A similar claim was filed on January 28, 2002, but it was denied on March 11, 2002, and was not appealed.  (Tr. 25).

2

Thus, this Court's review is limited to determining whether the Defendant's finding that S.F. was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

### Analysis

A child is considered disabled for SSI purposes only if the child suffers from a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and which lasts for a period of not less that 12 months.  42 U.S.C. § 1382c(a)(3)(C)(i).  A three-step sequential process is utilized when evaluating children's SSI claims.  20 C.F.R. § 416.924.  This process requires the ALJ to consider, in order, whether the child: 1) is engaged in substantial gainful activity; 2) has a severe impairment; and 3) has an impairment that meets, medically equals or functionally equals the requirements of a listed impairment.  Id.  As with the process for adults, if the ALJ determines that a child is or is not disabled at any point in this process, review does not proceed to the next step.  Id.  Thus, under the applicable regulations, an ALJ may find a child to be disabled within the meaning of the Social Security Act only if he finds that the child has a severe impairment or combination of impairments that meets, medically equals or functionally equals an impairment listed in Appendix 1.  20 C.F.R. § 416.924(d)(1); 42 U.S.C. 1382c(a)(3)(C)(i).

To determine whether a child's impairments functionally equals a listed impairment, the ALJ evaluates a child's functional limitations in six domains: 1) acquiring and using

3

information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for himself or herself; and 6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

These regulations provide that a child is "disabled" if he or she has an impairment or impairments of "listing-level severity" that is an "extreme" limitation in one of these domains or "marked" limitations in two or more domains. 20 C.F.R. § 416.926a(a). A marked limitation in a domain is found when an impairment interferes seriously with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An extreme limitation in a domain is found when the impairment interferes "very seriously" with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

In the instant action, the ALJ employed the three-step evaluation. First, the ALJ found that S.F. has not engaged in any substantial gainful activity since her alleged onset date. [Tr. 14, 20]. At step two, the ALJ determined that S.F. suffered from the following severe impairments: 1) hydrocephalus, and 2) asthma. [Tr. 14, 20]. In completing step three, however, the ALJ concluded that S.F. did not have an impairment that meets, medically equals, or is a functional equivalent to one of the Listing of Impairments. [Tr. 14, 20]. Thus, the ALJ determined that S.F. is not disabled. [Tr. 14, 20]. In making his determination, the ALJ cited substantial evidence, a summary of which now follows.

4

S.F. was born on December 22, 1999. [Tr. 14, 72]. At the time of the ALJ's decision, she was six years of age and attending kindergarten. [Tr. 14]. S.F.'s medical records reveal that she developed signs of hydrocephalus in May 2000, when Dr. Gilbert Alligood, her physician, measured her head circumference to be 49 centimeters. [Tr. 15-16, 685, 687, 711]. Dr. Alligood referred S.F. to Dr. Keith Tucci in June 2000. [Tr. 15, 711]. Dr. Tucci diagnosed S.F. with a communicating hydrocephalus and recommended a ventriculoperitoneal ("VP") shunt for treatment of this condition. [Tr. 15, 574, 711]. On June 21, 2000, Dr. Tucci performed a right VP shunt placement. [Tr. 15, 708]. S.F. did well following this surgery until May 2001, when she was found to have recurrent ventriculomegaly. [Tr. 15, 676]. S.F. was referred to Dr. Herbert Fuchs, of the Duke University Medical Center, who diagnosed her with hydrocephalus, with shunt failure. [Tr. 665]. On July 24, 2001[2], Dr. Fuchs performed a surgical revision and replacement of the shunt. [Tr. 15, 659-63].

Two months later, on September 6, 2001, Dr. Fuchs examined S.F. for her first postoperative visit. [Tr. 658]. S.F.'s treatment notes reveal that her family reported that she had been doing extremely well since the surgery. [Tr. 658]. She was more active, vocalizing more, and they had seen significant improvement in her condition. [Tr. 658]. However, during a subsequent visit with Dr. Fuchs on October 23, 2001, the doctor reported that

_____

[2] In his decision, the ALJ states that the procedure was performed on July 17, 2001. [Tr. 15]. However, S.F.'s medical records reflect that the procedure was performed on July 24, 2001. [Tr. 659-64].

5

although S.F. was doing very well post VP shunt surgery, her CT scans revealed that she probably had developed chronic subdural hematomas. [Tr. 15, 655, 657]. Initially, the hematomas were treated conservatively, however, when a follow-up CT was performed on December 21, 2001, it revealed that the hematomas were increasing in size. [Tr. 15, 653]. As a result, on January 9, 2002, Dr. Fuchs performed a shunt revision with replacement with a programmable valve shunt. [Tr. 15, 646-52]. During the surgery, the hematomas were drained, and a follow-up CT on January 14, 2002, revealed that the ventriculomegaly had decreased. [Tr. 15, 641, 646].

On subsequent physical exams through February 2002, Dr. Fuchs opined that S.F.'s activity level had increased and she was speaking more clearly. [Tr. 15, 639-40]. In addition, the doctor also reported that her motor strength was normal, her muscle strength was 5/5 in all extremities, and her gait was normal. [Tr. 15, 639-40].

On February 7, 2002, S.F. had physical therapy and speech therapy evaluations for use in an Individualized Family Service Plan (IFSP). [Tr. 15, 602-609]. During this visit, S.F. exhibited delays in her gross motor skills and in feeding. [Tr. 15, 603-604]. S.F. received more physical and occupational therapy at Edgecombe Nash Mental Health Center on March 12, 2002. [Tr. 15, 545-51]. For her mental status exam, the physician noted that S.F.'s biological functions were within normal limits, and her affect, attitude, motor activity, and appearance were all unremarkable. [Tr. 15, 549].

6

Several months later, on August 20, 2002, S.F. was examined again by Dr. Fuchs. [Tr. 15, 523]. The doctor noted that S.F. was ambulating without difficulty, and a CT of her head revealed improvement in the ventricular size and near complete resolution of the hematomas. [Tr. 15, 521, 523]. He also assessed that S.F. was awake, alert and interactive; she moved her extremities well; her shunt track was unremarkable; and he determined that she could be weaned off of her anti-seizure medication. [Tr. 523].

A few weeks later, on September 9, 2002, an updated IFSP report was prepared and it revealed that S.F. was doing well, she remained in daycare, and she received occupational and physical therapy every two weeks. [Tr. 15, 563]. In addition, Plaintiff reported that the therapies had been "very helpful" and that she was "very please[d] with the progress [S.F. has] made." [Tr. 15, 563].

However, on October 22, 2002, S.F.'s daycare teacher, Michelle Kennedy, reported that S.F.'s hands were very unsteady, she was unsteady and wobbly in walking, and that she lacked some coordination. [Tr. 15, 96]. She also reported that S.F. was at age-level in her cognitive abilities, in attending to and completing tasks, and in socialization. [Tr. 15, 95-96].

On November 6, 2002, an evaluation was performed on S.F. at the Developmental Evaluation Center. [Tr. 15, 308–15]. During the evaluation, the Vineland Adaptive Behavior Scales were administered to assess S.F.'s self-sufficiency and socialization skills. [Tr. 15, 309]. The results of this evaluation revealed that S.F.'s adaptive behavior was age

7

appropriate. [Tr. 15, 309]. S.F. was also administered the Bayley Scales of Infant Development to assess her cognitive ability. [Tr. 15, 313]. The results of this evaluation revealed that S.F. had obtained an age equivalent of two years and two months, which is indicative of borderline early cognitive ability. [Tr. 15, 313]. In addition, S.F.'s receptive language was considered borderline, her expressive language average, and her articulation was age appropriate. [Tr. 15, 313, 314]. She was found to have a six-month delay in gross and fine motor skills. [Tr. 15, 314]. It was recommended that S.F. continue receiving physical and occupational therapy. [Tr. 15, 314].

On February 11, 2003, S.F. had a follow-up visit with Dr. Fuchs. [Tr. 15, 520]. During the visit, Plaintiff reported that S.F. was making excellent developmental progress and was very active. [Tr. 15, 520]. When she was examined, Dr. Fuchs noted that S.F. was awake, alert, and cooperative. [Tr. 520]. In addition, her shunt tract was unremarkable and her neurological exam was normal. [Tr. 15, 520]. However, on June 6, 2003, S.F. was admitted to the Duke University Center for shunt failure. [Tr. 15, 402]. Dr. Fuchs performed another shunt revision and replacement on June 11, 2003. [Tr. 15, 408]. S.F. was discharged in stable condition and was permitted to "engage in a regular diet with moderate activity." [Tr. 403]. S.F. returned for follow-up visits with Dr. Fuchs in July and August 2003. [Tr. 15, 231, 366-67]. During both visits, Dr. Fuchs reported that S.F. was doing well and was back to full activity. [Tr. 15, 231, 366-67]. S.F.'s neurological findings remained within normal

8

limits. [Tr. 15, 231, 366-67].

On August 29, 2003, S.F. had a language evaluation. [Tr. 16, 223]. During the evaluation, Plaintiff reported that, initially, after the last shunt replacement, S.F. was having issues with drooling and dysarthria, but these issues had improved significantly since the surgery. [Tr. 223]. The results of the evaluation revealed that S.F. had mildly delayed express language skills. [Tr. 16, 225]. However, her articulation skills were within normal limits and her conversational intelligibility was judged to be good. [Tr. 225]. A couple of months later in December 2003, S.F. had another language evaluation and her assessment revealed that she had improvement in her language skills, with normal receptive and expressive language . [Tr. 16, 203-204]. Speech and language therapy was not recommended at that time, and the prognosis for improvement of S.F.'s speech/language skills through continued home stimulation was excellent. [Tr. 204].

S.F. returned for a visit with Dr. Fuchs on February 10, 2004. [Tr. 16, 229]. During this visit, the doctor opined that S.F. "has made an excellent recovery." [Tr. 16, 229]. His records also reveal that her family reported that she was getting back to her baseline level of activity, was improving the unsteadiness of her gait with physical therapy, and had been making excellent progress with balancing on one foot. [Tr. 16, 229]. Overall, her family felt that S.F. was "doing quite nicely." [Tr. 229]. A month later, on March 11, 2004, S.F. underwent physical and occupational therapy evaluations. [Tr. 16, 209-211]. The results of

these evaluations revealed that S.F. had mild delays in gross and fine motor skills and in visual motor integration. [Tr. 16, 210]. Physical therapy services were discontinued because it was determined that S.F. had received the maximal benefit from these services. [Tr. 210]. However, occupational therapy services were continued but it was recommended that the services could be performed via a home exercise program. [Tr. 16, 210].

On June 8, 2004, Dr. Samuel Wesonga performed a consultative examination on S.F. [Tr. 16, 244-46]. Plaintiff reported that since S.F.'s last surgery in June 2003, she has had difficulty with her speech and was in speech therapy until February 2004. [Tr. 16, 244]. S.F. also had difficulty with her extremities following the surgery, but regained most of those functions. [Tr. 16, 244]. Plaintiff also related that S.F. has a history with asthma, which was diagnosed in 2002. [Tr. 16, 244]. On examination, Dr. Wesonga noted that S.F.'s speech "currently is reported to be up to par." [Tr. 245]. The doctor also opined that her neurological exam was normal; S.F. was alert, cooperative, and moved all extremities grossly. [Tr. 16, 246]. In addition, S.F.'s speech appeared normal, there was no abnormal reflex elicited, and the Romberg testing was negative. [Tr. 246]. Ultimately, Dr. Wesonga's assessment of S.F. was that she had a history of hydrocephalus, status post ventricular shunting, and a history of asthma that appears to be mild and intermittent. [Tr. 246].

S.F. was examined again by Dr. Fuchs on August 17, 2004. [Tr. 16, 176]. The doctor reported that S.F. "has been doing quite well since we saw her last." [Tr. 17, 176]. During

the visit, S.F. underwent a CT scan, which did not show any evidence of shunt malfunction. [Tr. 16, 176, 177]. On examination, S.F. was in no acute distress, her funduscopic exam was negative, and her shunt track was unremarkable. [Tr. 16, 176]. Dr. Fuchs recommended that S.F. return in approximately one year for a repeat CT scan, and possibly sooner if any problems arose. [Tr. 176]. Several months later, on February 22, 2005, S.F. received a PT pediatric evaluation. [Tr. 16, 179-81]. The results of the evaluation revealed that S.F. only had mild gross motor delays and moderate fine motor and visual-motor integration delays. [Tr. 16, 180].

S.F.'s most recent follow-up for her shunt evaluation with Dr. Fuchs was on August 17, 2005. [Tr. 16, 175]. During this visit, the doctor noted that S.F. had not been having any headaches, she had been doing well, and would start kindergarten in a week or so. [Tr. 175]. On exam, her shunt tract was unremarkable, her cranial nerves were intact, and she had 5/5 strength bilaterally. [Tr. 16, 175]. After the examination, Dr. Fuchs assessed that S.F.'s shunted hydrocephalus was stable, and recommended that she return for a follow-up visit in one year. [Tr. 16, 175].

After weighing all the evidence of S.F.'s hydrocephalus treatment, the ALJ concluded that S.F.'s condition "does not meet the relevant criterial in Listing 111.08D since she does not have a non-compensated hydrocephalus and her condition has not significantly interfered with her mental or motor developmental progression." [Tr. 17]; see 20 C.F.R. Part 404,

Appx. 1, 111.08D. Specifically, the ALJ noted that S.F.'s "motor function is only mildly delayed and does not meet the criteria in Listing 112.02B which specifies gross or fine motor development of no more than ½ the child's chronological age as indicative of a disabling impairment." [Tr. 17].

With regards to S.F.'s second impairment, her asthma, her medical records reveal that Dr. Alligood had been treating this condition over the past couple of years. S.F. has had occasional asthmatic flares characterized by wheezing and rhonci. [Tr. 16, 613, 671, 677, 683-84]. However, she has not required any periods of inpatient treatment and has only been seen in the emergency room for this condition on one occasion. [Tr. 16, 474-77, 636]. To help control the condition, Dr. Alligood has prescribed albuteral, flovent, and zyrtec. [Tr. 16, 613, 677, 683, 684]. In addition, when S.F. had acute flares, she has responded rapidly to home treatment, and her lungs have been clear with good airway entry and movement when examined between flares. [Tr. 16, 610, 613]. On July 17, 2003, Dr. Alligood characterized S.F.'s asthma as well controlled on current medications. [Tr. 16, 298]. He reaffirmed this assessment on October 16, 2003, and again on February 3, 2005. [Tr. 16, 295, 191]. In addition, even though S.F. had a subsequent acute respiratory flare in March 2005, it resolved rapidly with treatment. [Tr. 16, 190]. Similarly, during Dr. Wesonga's exam in June 2004, he opined that S.F.'s asthma was only mild and intermittent. [Tr. 16, 244].

After weighing this evidence, the ALJ concluded that S.F.'s "asthma does not meet

the relevant criteria in Listing 103.03 because she does not have acute attacks requiring physician intervention occurring at least once every 2 months or at least 6 times per year." [Tr. 17-18]. Specifically, the ALJ noted that S.F. "does not have any of the other clinical abnormalities identified in Listing 103.03A-D as indicative of a disabling asthma impairment." [Tr. 18]; see 20 C.F.R. Part 404, Appx. 1, 103.03A-D. Furthermore, the ALJ stated that S.F.'s "conditions are not manifested by other clinical findings indicating a level of severity comparable to the criteria of those Listings and, therefore, her conditions can not be found to be medically equal the Listings." [Tr. 18].

S.F.'s most recent report card reveals that she performed satisfactorily in school. [Tr. 90].

During the hearing in this matter, Plaintiff described S.F.'s history of surgery for her hydrocephalus. [Tr. 17, 726-27, 730]. She related that S.F. had physical delays due to the surgery and had just recently finished her physical and occupational therapy in April 2005. [Tr. 17, 728-30]. Plaintiff also testified that S.F.'s fine and gross motor skills were still delayed and that she would be evaluated in January 2006, to determine if she is entitled to services under an IEP. [Tr. 17, 731]. Furthermore, Plaintiff stated that S.F. has had asthma since she was two years old and takes flovent and albuterol to treat this condition; she has also required prednisone a few times. [Tr. 17, 732-34]. In general, S.F. is restricted from activities that involve a lot of jumping to avoid injuries to her head because of the shunt. [Tr.

17, 735]. Plaintiff concluded her testimony by relating that S.F. did not have any emotional

difficulties; she is able to get along and play well with other children. [Tr. 17, 736].

With regards to the evidence of record, the ALJ made the following findings:

The Administrative Law Judge finds that the allegations of the claimant's functional limitations are not fully supported by the longitudinal record. The claimant's hydrocephalus has been corrected by surgery. Although she has had several malfunctions of her shunt, these were also corrected. The claimant does not have any residual neurological deficits related to the hydrocephalus. Although she has some fine and gross motor delays, these are only mild and have not interfered with the claimant's ability to perform normal activities of daily living or to progress in school. The claimant has not had frequent acute asthmatic attacks and she does not have any clinical signs of respiratory insufficiency related to this condition. In addition, the medical evidence does not reveal any evidence of a change in motor tone or bulk such as disuse, atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process. These factors indicate that the claimant's allegations of functional restrictions are not fully credible.

[Tr. 17].

The ALJ also weighed the opinions of various State agency medical consultants. [Tr. 17].

The State agency consultants found that the claimant had a less than marked limitation in 4 domains of functioning and no limitation in the other domains of functioning. The Administrative Law Judge finds that these assessments are generally consistent with the longitudinal medical and school records and gives great weight to these assessments with the exception of their rating in the domain of interacting and relating with others since there is no indication of any problems in this area.

[Tr. 17].

14

After concluding that S.F's impairments did not meet, or medically equal, a listed impairment, the ALJ evaluated whether S.F. had an impairment that was "functionally equal" to the listings. [Tr. 18]. In making this determination, the ALJ considered the six domains of functioning. Specifically, he ALJ made the following findings:

1) Acquiring and Using Information: This domain considers how well the child acquires or learns information, and how well the child uses information learned. In this domain, the child has less than "marked" limitations. Although a Bayley test in November, 2002 revealed a mental development index of 75, subsequent occupational and physical therapist [sic] evaluations revealed no significant impairment in cognitive functioning. The claimant is in a regular kindergarten class placement and is achieving satisfactory grades.

2) Attending and Completing Tasks: This domain considers how well the child focuses and maintains attention; begins, carries through, and finishes activities (including the pace activities are performed); and the ease with which the child changes activities. In this domain, the child has no limitations.

3) Interacting and Relating with Others: The issue in this domain is how well the child initiates and sustains emotional connections with others, develops and uses the community's language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. In this domain, the child has no limitations.

4) Moving About and Manipulating Objects: This domain considers how well the child's gross motor skills (body movement) and fine motor skills (hand and finger movements) have developed. In this domain, the child has less than "marked" limitations. Physical therapist and occupational therapist evaluations reveal that the claimant has mild to moderate delays in fine and gross motor function.

5) Caring for Yourself (Self-care): The issue in this domain is how well the child maintains a healthy emotional and physical state including appropriately seeking and maintaining physical and emotional wants and needs; coping with stress and environmental changes; and caring for his or her own health, possessions, and living area. In this domain, the child has no limitations.

6) In this domain, the issue is the cumulative physical restrictions upon functioning of physical and mental impairments and their associated treatments or therapies on the child's functioning not considered in the "Moving About

15

and Manipulating Objects" domain. In this domain, the child has less than "marked" limitations based on her history of multiple surgeries for failed hydrocephalus shunts. She must be careful to avoid head injuries. Her neurological findings are normal, however. Because the child does not have an "extreme" limitation in one area of functioning or a "marked" limitation in two areas, the child does not functionally equal, singly or in combination, any listed impairment. Because the child does not have an impairment or combination of impairments which meets, medically equals any listing, or functionally equals any listing, the undersigned concludes the child is not "disabled" for purposes of eligibility for Supplemental Security Income payments.

[Tr. 19-20].

Accordingly, the ALJ concluded that S.F. was not disabled for the purposes of eligibility for SSI payments. [Tr. 20].

The undersigned shall now address Plaintiff's assignments of error.

## Assignments of Error

Plaintiff cites two assignments of error to the ALJ's decision. Plaintiff argues that: 1) "[t]he ALJ erred by not finding that S.F. was disabled based on her objective testing results showing developmental delays, four neurosurgeries and frequent asthma exacerbations"; and 2) "[t]he ALJ failed to consider the opinions of the state agency consultants." **[DE-11, pgs. 2-6]**. For the reasons stated below, both assignments of error are without merit.

**1.      S.F.'s Impairments**

**a.      Hydrocephalus**

Plaintiff challenges the ALJ's decision regarding S.F.'s hydrocephalus on two grounds. First, she alleges that the ALJ did not take into account the effects of S.F.'s four neurosurgeries. **[DE-11, pgs. 2-3]**. Second, Plaintiff contests the ALJ's conclusion that S.F. had less than marked limitations in the "Moving Around and Manipulating Objects" domain. **[DE-11, p. 4]**. Specifically, Plaintiff argues that when making this determination, the ALJ "failed to mention any of the test results or explain why he apparently found them to be invalid." **[DE-11, p. 4]**.

Plaintiff's arguments do not accurately reflect the ALJ's analysis. In his decision, the ALJ discussed, in detail, S.F.'s initial surgery for the shunt placement and her three subsequent surgeries to correct the shunt malfunctions. [Tr. 15, 17]. However, the ALJ also noted that despite the developmental delays after the surgeries, S.F.'s treatment notes reveal that she made good progress and was doing well [Tr. 16, 175, 235, 298, 520, 523, 525, 658, 665 ], her neurological findings were normal [Tr. 16, 231, 235], and in her most recent exam in August 2005, the doctor noted that her hydrocephalus was stable and the shunt tract was unremarkable. [Tr. 16, 175].

In addition, despite Plaintiff's assertions to the contrary, the ALJ did in fact discuss several of S.F.'s test results including evaluations from: November 2002 [Tr. 15]; December 2003 [Tr. 16]; March 2004 [Tr. 16]; and February 2005 [Tr. 16]. These test results support his conclusion that S.F. has "less than marked" limitations in the "Moving Around and

17

Manipulating Objects" domain. For example, in November 2002, the evaluation revealed that S.F. only had a six-month delay in fine and gross motor development [Tr. 314]; in December 2003, S.F. presented with "mild delays in gross motor skills" [Tr. 207]; in March 2004, S.F. presented with "mild delays in gross motor skills" and was discontinued from physical therapy [Tr. 210]; and in February 2005, it was assessed that S.F. had "moderate delays" in her fine and gross motor skills [184].

The ALJ also cited other substantial evidence in the record that supported his conclusion about S.F.'s limitation. Specifically, in his decision, the ALJ gave various State Agency medical consultants opinions' great weight. [Tr. 17]. One of the opinions was from Dr. Wesonga, who evaluated S.F. on June 8, 2004, for a disability evaluation. [Tr. 244-46]. Based on his examination, the doctor opined that S.F. had no cyanosis, clubbing, or pitting edema present in her extremities, she had good peripheral pulses, good range of motion, and her gait was normal. [Tr. 246].

Another opinion was from medical consultant, Dr. Sankar Kumar, who performed an evaluation of S.F. on June 25, 2004. [Tr. 238-43]. In this evaluation, the doctor concluded that S.F. had "less than marked" limitations in the "Moving About and Manipulating Objects" domain. [Tr. 241]. In support of this conclusion, the doctor cited evidence from S.F.'s records, which revealed that while she had trouble using a spoon to eat, she did well with her hands, did not have any problems in all of her joints, had recently been discharged

from occupational therapy, and was able to catch a ball. [Tr. 241].[3]

Thus, although Plaintiff may have cited conflicting evidence in support of her argument about S.F.'s limitations, the role of this Court is not to undertake to re-weigh conflicting evidence or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Therefore, Plaintiff's argument is without merit.

**b.      Asthma**

Plaintiff next asserts that the ALJ erred by not finding that S.F. was disabled even though "[t]he record is filled with treatments for asthma and bronchitis exacerbations beginning at less than a year of age." **[DE-11, p. 3]**. In his decision, the ALJ cited substantial evidence in support of his conclusion that S.F.'s asthma did not meet the relevant listing of impairments. See [Tr. 16, 17-18]. The Court must uphold the Defendant's factual findings if they are supported by substantial evidence. Craig, 76 F.3d at 589. Thus, although Plaintiff may disagree with the ALJ's conclusions, the role of this Court is not to undertake to re-weigh conflicting evidence or substitute its judgment for that of the Secretary. Id. For this reason, Plaintiff's argument is without merit.

**2.      State Agency Consultants Opinion**

---

[3] Notably, Plaintiff cites two State Agency medical consultant opinions', that the ALJ omitted from his decision, to support her argument that the ALJ's decision is erroneous. However, in one of the evaluations from January 28, 2002, the doctor concluded that S.F. did not have any limitation in the "Moving About and Manipulating Objects" domain. [Tr. 588]. In addition, in the other evaluation from June 16, 2003, the doctor concluded that S.F. has "less than marked" limitation in the "Moving About and Manipulating Objects" domain. [Tr. 357].

In Plaintiff's second assignment of error, she asserts that the ALJ's decision is "not supported by substantial evidence because he failed to take into account two of the three medical opinions on file." **[DE-11, p. 6]**. Plaintiff argues that these two opinions are significant because they concluded that S.F. had a marked limitation in the "Health and Well-Being" domain.[4] **[DE-11, p. 6]**.

While Plaintiff accurately notes that the ALJ failed to include these opinions in his decision, this oversight is not fatal to the ALJ's ultimate conclusion regarding S.F.'s disability status. For example, for S.F. to be found disabled, she would have to have marked limitations in at least two of the six "domains of functioning." [Tr. 18]. However, the consultants at issue concluded that S.F. only had a marked limitation in one of the "domains of functioning." [Tr. 357, 588]. In addition, despite the omission of their opinions in the ALJ's decision, their ultimate conclusion was consistent with the ALJ's in that they noted that S.F. has an "impairment or combination of impairments [that] is severe, but does not meet, medically equal, or functionally equal the listings." [Tr. 354, 585]. Therefore, Plaintiff's argument is without merit. See Ngarurih v. Ashcroft, 371 F.3d 182, 191, n.8 (4th Cir. 2004) (stating that for administrative orders, "reversal is not required when the alleged error 'clearly had no bearing on the procedure used or the substance of the decision

---

[4] The evaluations by the consultants were conducted within days of two of S.F.'s four surgeries: the first evaluation was conducted on January 28, 2002 [Tr. 585-90], and the second evaluation was conducted on June 16, 2003 [Tr. 354-59].

reached.'") (quoting <u>Securities and Exchange Commission v. Chenery Corp.</u>, 318 U.S. 80, 95 (1943)); <u>see also</u>, <u>Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. Ill. 1989)</u> (concluding that "[n]o principle of administrative law or common sense requires [the court] to remand a case in [a] quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

### Conclusion

For the reasons discussed above, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings **[DE-10]** be DENIED and the Defendant's Cross-Motion for Judgment on the Pleadings **[DE-18]** GRANTED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 4th day of June, 2009.

_____
William A. Webb
U.S. Magistrate Judge